**IN THE UNITED STATE DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

|  |  |
|---|---|
| **JANE DOE, Individually, and on behalf of all others similarly situated,** | ) ) ) |
| **Plaintiff** | ) ) |
| **v.** | ) ) |
| **UPPERLINE HEALTH, INC. d/b/a UPPERLINE HEALTH INDIANA,** | ) ) ) |
| **Defendant.** | ) ) ) |

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff, JANE DOE, Individually, and on behalf of all others similarly situated (hereinafter "Plaintiff") brings this Class Action Complaint against Defendant, UPPERLINE HEALTH, INC. d/b/a UPPERLINE HEALTH INDIANA (hereinafter "UHI" or "Defendant"), and alleges, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

### INTRODUCTION

1.      Plaintiff brings this class action to address Defendant's outrageous, illegal, and widespread practice of disclosing the confidential Personally Identifying Information ("PII")[1] and/or Protected Health Information ("PHI")[2] (collectively referred to as "Private Information")

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C.
 § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the

of Plaintiff and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"), Google, LLC ("Google"), Microsoft Corp. ("Microsoft"), StackAdapt, CallRail, and possible others ("the Disclosure").

2.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system.

3.      Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

4.      UHI is a "[c]omprehensive [f]oot and [a]nkle care" provider that operates over a

---

provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). UHI is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

dozen podiatry clinics across the state of Indiana, including in Anderson, Carmel, Columbus, Fishers, Franklin, Indianapolis, Jasper, Kokomo, Muncie, Noblesville, Richmond, Seymour, and Tipton.[3] UHI describes itself as "offer[ing] the highest quality lower extremity care" and "strive[ing] to provide the most appropriate care based on [patients'] unique needs."[4]

5.      Defendant encouraged its patients to use its website, https://www.upperlinehealthindiana.com/,[5] (the "Website") and its various web-based tools (collectively referred to as "Online Platforms") to access its patient portal, pay bills, complete new patient paper work, view its offered services, find a doctor, find a location, and more.

6.      Despite its position as a local, trusted healthcare provider, UHI knowingly configured and implemented into its Website devices known as "pixels," which then collected and transmitted patients' information to third parties.  This included information communicated by patients through Defendant's sensitive and presumptively confidential Online Platforms.

7.      When Plaintiff and Class Members used Defendant's Online Platforms, they thought they were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded pixels from Facebook, Google, Microsoft, and others into its Website and Online Platforms, surreptitiously forcing Plaintiff and Class Members to transmit intimate details about their medical treatment to third parties.

8.      A pixel (also referred to as a "tracker" or "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website

---

[3] *See* UPPERLINE HEALTH INDIANA, http://www.upperlinehealthindiana.com (April 3, 2023) (archived at https://web.archive.org/web/20230403185108/https://www.upperlinehealthindiana.com/); *see also* Find a Location, UPPERLINE HEALTH, https://upperlinehealth.com/find-location/ (search "Indiana") (last visited July 14, 2023).
[4] UPPERLINE HEALTH INDIANA, http://www.upperlinehealthindiana.com (April 3, 2023) (archived at https://web.archive.org/web/20230403185108/https://www.upperlinehealthindiana.com/).
[5] UHI removed its Indiana-focused website sometime after April 3, 2023. The URL, http://www.upperlinehealthindiana.com, now redirects to http://www.upperlinehealth.com.

interactions.[6] When a person visits a website with an embedded pixel, the pixel tracks "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[7] Then, the pixel transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[8]

9.     Among the pixels Defendant embedded into its Website and Online Platforms is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information about a visitor's device, including their IP address, and the pages viewed.[9] When configured, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[10] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[11]

10.     The Meta Pixel was present on Defendant's Website from at least January 28, 2021, to April 3, 2023.

11.     Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiff and Class Members' Private Health Information alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant

---

[6] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last visited Mar. 19, 2023).
[7] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[8] *Id.*
[9] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 22, 2023).
[10] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[11] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

effectively planted a bug on Plaintiff and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

12.    In addition to its use of the Meta Pixel to spy on and transmit Plaintiff's and Class Members' Private Information, Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI").[12]

13.    Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers.[13, 14]

14.    Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[15]

15.    Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from

---

[12] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Jan. 25, 2023).

[13] What is the Facebook Conversion API and How to Use It, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/ (last updated May 20, 2022).

[14] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." Conversions API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited May 15, 2023).

[15] About Conversions API, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).

sending website users' Private Information to Facebook directly.

16.    Defendant utilized data from these trackers to market its services and bolster its profits. Meta Pixel and CAPI are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendant.

17.    The information that Defendant's Meta Pixel and CAPI sent to Facebook can include the Private Information that Plaintiff and Class Members submitted to Defendant's Website, including, for example, the contents of their search queries, the pages they visited, the buttons that they clicked, and what they typed, linked to Plaintiff's or Class Member's IP address or other identifying detail.

18.    Such information allows a third party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers, who then geotarget Plaintiff's and Class Members' Facebook pages based on communications obtained via the Meta Pixel and CAPI. Facebook and any third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

19.    In addition to the Facebook tracker and CAPI, Defendant installed other tracking technology, including Facebook Events, Google Analytics with Google Tag Manager, Microsoft Universal Event Tracking, StackAdapt, and CallRail. On information and belief, these trackers operate similarly to the Meta Pixel and transmit a website user's Private Information to other third parties.

20.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send Personal Health Information or other confidential medical information collected via its webpages to a hidden third party—let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without the patients' consent.

21.     Neither Plaintiff nor any Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook, Google, Microsoft, StackAdapt, CallRail, or any other third parties uninvolved in their treatment.

22.     Despite willfully and intentionally incorporating tracking technology, including the Meta Pixel, potentially CAPI, and other tracking technology, into its Website and servers, UHI has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with third parties including Facebook, and possibly Google, Microsoft, StackAdapt, CallRail, and others.

23.     Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to Facebook and other third parties as they communicated their confidential PHI with their healthcare provider via the Website.

24.     Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant.

25.     Defendant owed common law, statutory, and regulatory duties to keep Plaintiff's and Class Members' communications and Private Information safe, secure, and confidential.

26.     Upon information and belief, UHI utilized the Meta Pixel and other tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

27.    Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

28.    Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, *inter alia*,: (i) failing to adequately review its marketing programs and web based technology to ensure the hospital Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook and others; (v) failing to protect Private Information and take steps to block the transmission of Plaintiff's and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

29.    Plaintiff seeks to remedy these harms and bring causes of action for (I) Negligence; (II) Invasion of Privacy; (III) Breach of Fiduciary Duty; (IV) Violation of the Indiana Deceptive Consumer Sales Act; and (V) Violation of the Indiana Wiretapping Act.

**PARTIES**

30.    Plaintiff Jane Doe is a natural person and a resident and citizen of Indiana, where she intends to remain, with a principal residence in Kokomo in Howard County. She is a former patient of UHI's Kokomo clinic, located at 2130 W Sycamore St., Suite 150, Kokomo, Indiana 46901. Ms. Doe is a victim of Defendant's unauthorized Disclosure of Private Information.

31.    Defendant, Upperline Health, Inc. d/b/a Upperline Health Indiana ("UHI" or

"Defendant"), is a for-profit corporation organized in Delaware with its principal place of business at 4101 Charlotte Ave., Nashville Tennessee, 37209. It operates around fourteen clinics in the State of Indiana, located in the municipalities of Anderson, Carmel, Columbus, Fishers, Franklin, Indianapolis, Jasper, Kokomo, Muncie, Noblesville, Richmond, Seymour, and Tipton, Indiana.

## JURISDICTION AND VENUE

32.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (1) there are more than one hundred Class Members; (2) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (3) at least one member of the proposed Class is a citizen of a different state than Defendants.

33.     This Court has personal jurisdiction over UHI because UHI has purposefully established sufficient minimum contacts with the state of Indiana by doing business in this state, operating in over a dozen locations in Indiana, marketing itself to Indiana residents, and providing services to Indiana residents, including to Plaintiff. Moreover, Plaintiff's claims bear a close relationship with Defendant's contacts with the state and arise out of those contacts. By doing business in the state of Indiana, UHI has purposefully availed itself of the forum, and the possibility of UHI being haled into court was foreseeable.

34.     The Court has supplemental jurisdiction over Plaintiff's claims arising under state law under 28 U.S.C. § 1367.

35.     Venue properly lies in this district pursuant because a substantial part of the events and/or omissions giving rise to the claims occurred within this district under 28 U.S.C. § 1391(b)(2) and because UHI is a resident of Indiana for the purposes of venue under 28 U.S.C. § 1391(c)(2).

## COMMON FACTUAL ALLEGATIONS

### A. Background

36.     UHI operates a for-profit network of podiatry clinics in over a dozen locations across the state, including in Anderson, Carmel, Columbus, Fishers, Franklin, Indianapolis (two locations), Jasper, Kokomo, Muncie, Noblesville, Richmond, Seymour, and Tipton, Indiana.[16]

37.     Defendant promotes the convenience and comprehensive functionality of its Online Platforms, which it encourages patients to use to access its patient portal, pay bills, submit new patient paper work, learn about its offered services, find a doctor, find a location, and more.

38.     In furtherance of that goal and to increase the success of its advertising and marketing and sales, Defendant purposely installed the Meta Pixel and trackers on its Website and Online Platforms. In doing so, Defendant surreptitiously shared patients' private and protected communications, including those containing Plaintiff's and Class Members' Private Information, with Facebook and other third parties.

39.     To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.

### i.    *Facebook's Business Tools and the Meta Pixel*

40.     Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[17]

41.     In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

---

[17] Meta Reports Fourth Quarter and Full Year 2021 Results, FACEBOOK  https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022).

42.     Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

43.     The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, the webpage's Universal Resource Locator ("URL"), as well as metadata, button clicks, and other information.[18] Businesses that want to target customers and advertise their services, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[19]

44.     One such Business Tool is the Meta Pixel, a tool that "tracks the people and type of actions they take."[20] When a user accesses a webpage that is hosting the Meta Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook—traveling from the user's browser to Facebook's server.

45.     Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy and disable it on pages that do implicate patient privacy.

46.     The Meta Pixel's primary purpose is for marketing and ad targeting and sales generation.[21]

---

[18] Specifications for Facebook Pixel Standard Events, META, https://www.facebook.com/business/help/402791146561655 (last visited Jan. 31, 2023); see also Facebook Pixel, Accurate Event Tracking, Advanced, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; see also Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; App Events API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Jan. 31, 2023).

[19] About Standard and Custom Website Events, META, https://www.facebook.com/business/help/964258670337005; see also Facebook, App Events API, supra.

[20] Retargeting, META, https://www.facebook.com/business/goals/retargeting.

[21] See Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).

47.     Facebook's own website informs companies that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[22]

48.     According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** (emphasis added).

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[23]

49.     Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.

- **Drive more sales**. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[24]

50.     Facebook likewise benefits from the data received from the Meta Pixel and uses the

---

[22] About Meta Pixel, META,
https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).
[23] Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[24] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).

data to serve targeted ads and identify users to be included in such targeted ads.

  ii.   **Defendant's method of transmitting Plaintiff's and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel**

51.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

52.    Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

53.    Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[25]

54.    GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

55.    When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information. The entity's servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that

---

[25]"Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

appear on the patient's screen as they navigate a website.

56.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

57.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

58.     Defendant's implementation of the Meta Pixel is source code that acted much like a traditional wiretap, intercepting and transmitting communications intended only for Defendant.

59.     Separate from the Meta Pixel, Facebook and other website owners can place third-party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as she moves around the internet—whether on the cookie owner's website or not. Facebook uses this type of third-party cookie when Facebook account holders use the Facebook app or website. As a result, when a Facebook account holder uses Defendant's Website, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the patient associated with the Private Information it has intercepted.

60.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. To counteract this, third parties bent on gathering data and Private Information implement workarounds that are difficult to detect or evade. Facebook's workaround is its Conversions API tool, which is particularly effective because the data transmitted via this tool does not rely on the website visitor's web browsers. Rather, the information travels directly from the entity's server to Facebook's server.

61.    Conversions API "is designed to create a direct connection between [web hosts']
marketing data and [Facebook]."[26] Thus, the entity receives and stores its communications with
patients on its server before Conversions API collects and sends those communications—and the
Private Information contained therein—to Facebook.

62.    Notably, client devices do not have access to host servers and thus cannot prevent
(or even detect) this additional transmission of information to Facebook.

63.    While there is no way to confirm with certainty that a website owner is using
Conversions API without accessing the host server, Facebook instructs companies like Defendant
to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both
tools," because such a "redundant event setup" allows the entity "to share website events [with
Facebook] that the pixel may lose."[27]  Thus, if an entity implemented the Meta Pixel in accordance
with Facebook's documentation, it is also reasonable to infer that it implemented the Conversions
API tool on its Website.

64.    The third parties to whom a website transmits data through pixels and other tracking
technology do not provide any substantive content on the host website. In other words, Facebook
and others like it are not providing anything to the user relating to the user's communications.
Instead, these third parties are typically procured to track user data and communications only to
serve the marketing purposes of the website owner (i.e., to bolster profits).

65.    Accordingly, without any knowledge, authorization, or action by a user, a website
owner like Defendant can use its source code to commandeer its patients' computing devices,
causing the device's web browser to contemporaneously and invisibly re-direct the patients'

---

[26] About Conversions API, META, https://www.facebook.com/business/help/2041148702652965 (last
visited May 15, 2023).
[27] See Best Practices for Conversions API, META,
https://www.facebook.com/business/help/308855623839366 (last visited May 15, 2023).

communications to hidden third parties like Facebook.

66.     In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

67.     Consequently, when Plaintiff and Class Members visited Defendant's website and communicated their Private Information, it was simultaneously intercepted and transmitted to Facebook.

68.     UHI also employed other trackers, including Facebook Events, Google Analytics with Google Tag Manager, Microsoft Universal Event Tracking, StackAdapt, and CallRail, which, on information and belief, likewise transmitted Plaintiff's and the Class Members' Private Information to third parties without Plaintiff's and Class Members' knowledge or authorization.

### iii.     *Defendant Never Informed Plaintiff and Class Members About its Lack of Privacy Practices*

69.     Although UHI regularly discloses its patients' Private Information to Facebook, Google, and likely other third parties, it never informed Plaintiff or Class Members that their communications with their health care provider, via Defendant's Online Platforms, were not confidential and that their use of Defendant's Website was not private.

70.     UHI does not provide a written Privacy Policy or Notice of Privacy Practices to users of its Website or otherwise notify Website users of its privacy policy and practices.

71.     Accordingly, Plaintiff and Class Members were never aware that their confidential communications with their healthcare provider would be intercepted and transmitted to Facebook or that their use of Defendant's Website was not private. Plaintiff and Class Members never authorized Defendant to transmit their confidential communications to Facebook, Google, or other third parties, nor did they authorize the Disclosure of their private information.

72.     Further, Plaintiff and Class Members never authorized Defendant to use their Private Information for the purposes of marketing and advertising, nor did it notify Plaintiff and Class Members that their Private Information would be used for these purposes.

73.     Plaintiff and Class Members had a reasonable expectation that their communications with their health care provider would remain confidential.

74.     Despite this, Defendants used and disclosed Plaintiff's and Class Member's Private Information and confidential communications to Facebook, Google, and likely other unauthorized third parties, without permission, without notifying Plaintiff and Class Members, and without Plaintiff's and Class Members' permission or authorization.

75.     Defendants disclosed Plaintiff's and Class Members' Private Information and confidential communications to Facebook and others by collecting and transmitting user interactions with Defendant's Website and sending records of those interactions to Facebook. For example, when a patient visits Defendants' Website and clicks "Services," "Patient Portal," "Schedule Appointment," or "Pay Bill," the Meta Pixel would send to Facebook a record of each of the user's clicks. Additionally, as the patient navigates through the Website, the Meta Pixel would also transmit the page and content of each page a user viewed. By sending to Facebook this information, alongside identifying details, such as IP addresses, Defendant unlawfully disclosed Plaintiff and Class Members' Private Information and breached their privacy.

76.     Defendant could have chosen not to use the Meta Pixel, or it could have configured the Pixel to limit the information that it communicated to third parties. It did not. Instead, it intentionally took advantage of the Meta Pixel's features and functions, resulting in the Disclosure of Plaintiff's and Class Members' Private Information.

77.     Along those same lines, Defendant could have chosen not to use Facebook Events,

17

Google Analytics with Google Tag Manager, Microsoft Universal Event Tracking, StackAdapt, CallRail, and possibly other tracking technologies to record Plaintiff and Class Members private communications and transmit that information to unauthorized third parties. It did so anyway, intentionally taking advantage of these trackers despite the harm to Plaintiff and Class Members' privacy.

78.     Defendant disclosed Plaintiff's and Class Members' Private Information to Facebook, Google, and possibly other third parties for the purpose of marketing its services and increasing its profits.

79.     On information and belief, Defendants shared, traded, or sold Plaintiff's and Class Members' Private Information with Facebook, and potentially other third parties, in exchange for improved targeting and marketing services.

80.     Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant UHI to intercept their communications or to use or disclose their Private Information for marketing purposes. Plaintiff was never provided with any written notice that Defendant disclosed its patients' Protected Health Information to Facebook and others, nor were they provided any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed Plaintiff's Protected Health Information to unauthorized entities.

81.     Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

82.     By law, Plaintiff and the Class Members are entitled to privacy in their Protected Health Information and confidential communications. UHI deprived Plaintiff and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and

disclosed Plaintiff's and Class Members' confidential communications, Personally Identifiable Information, and Protected Health Information; (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook and possibly others; and (3) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

### B. Plaintiff's Experience

83.    Plaintiff Jane Doe was a patient of Defendant from April to October 2022 and was treated by UHI physicians at UHI's Upperline Health Kokomo clinic in Kokomo, Indiana. She relied on UHI's Online Platforms to communicate confidential patient information.

84.    Over the six months she was a patient, Ms. Doe accessed Defendant's Online Platforms somewhere between five and ten times. Ms. Doe reasonably expected that her online communications with UHI were confidential, solely between herself and UHI, and that, as such, those communications would not be transmitted to or intercepted by a third party.

85.    Plaintiff Ms. Doe provided her Private Information to Defendant and trusted that the information would be safeguarded according to UHI's privacy policies and the law.

86.    Through its use of the Meta Pixel and tracking technology, UHI sent Ms. Doe's Private Information to Facebook, Google, Microsoft, and possibly others. UHI also assisted Facebook and possible others with intercepting Ms. Doe's confidential communications. UHI facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization.

87.    By failing to receive the requisite consent, UHI breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

## C. Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI

88.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[28] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

89.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data.  The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway.  The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."[29]

90.    The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data.  In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling:  the company was sharing their data with Facebook.[30] When a user was having her period

---

[28] Kurt Wagner & Bloomberg, Facebook Admits Another Blunder with User Data, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.
[29] New York State Department of Financial Services, REPORT ON INVESTIGATION OF FACEBOOK INC. DATA PRIVACY CONCERNS, (Feb. 18, 2021)
https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.
[30] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.) https://slate.com/technology/2022/06/health-data-brokers-privacy.html.

or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising.  In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[31]

91.    More recently, Facebook employees admitted to lax protections for sensitive user data.  Facebook engineers on the ad business product team conceded in a 2021 privacy review that "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[32]

92.    Furthermore, in June 2022, an investigation by The Markup[33] revealed that the Meta Pixel was embedded on the websites of 33 of the top 100 hospitals in the nation.[34] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data," including sensitive personal health information, whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[35] The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific

---

[31] *Id.*

[32] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

[33] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. *See* www.themarkup.org/about (last accessed Mar. 19, 2023).

[34] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[35] *Id.*

individual or household—creating an intimate receipt of the appointment request for Facebook."[36]

93.    During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[37]

94.    In addition to the 33 hospitals identified by The Markup that had installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[38]

95.    David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated she was "deeply troubled" by what the hospitals capturing and sharing patient data in this way.[39]

**D. Defendant Violated HIPAA Standards**

96.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[40]

97.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

98.    In Guidance regarding Methods for De-identification of Protected Health

---

[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[41]

99.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[42]

100.    In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[43]

101.    According to the Bulletin, "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors

---

[41] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.
[42] U.S. Department of Health and Human Services, Marketing, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.
[43] *See* U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

includes protected health information."[44]

102.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [45]

103.    In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel is a violation of HIPAA Rules.

### E. Defendant Violated Industry Standards

104.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

105.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to UHI and its physicians.

---

[44] *Id.*
[45] *Id.* (emphasis in original) (internal citations omitted).

106.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

107.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

108.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

## F. Plaintiff's and Class Members' Expectation of Privacy

109.    At all times when Plaintiff and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

## G. IP Addresses are Personally Identifiable Information

110.    Defendant also disclosed and otherwise assisted Facebook and potentially others with intercepting Plaintiff's and Class Members' IP addresses using the Meta Pixel and other tracking technologies.

111.    An IP address is a number that identifies the address of a device connected to the

Internet.

112.    IP addresses are used to identify and route communications on the Internet.

113.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

114.    Facebook tracks every IP address ever associated with a Facebook user.

115.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

116.    Under HIPAA, an IP address is Personally Identifiable Information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.  *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

117.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

**H. Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures**

118.    The sole purpose for Defendant's use of the Meta Pixel and other tracking technology was marketing and profits.

119.    In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook and likely others in the form of enhanced advertising services and more cost-efficient marketing on its platform.

120.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its

marketing campaign, Defendant re-targeted patients and potential patients.

121.    By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

**I.    Plaintiff's and Class Members' Private Information Had Financial Value**

122.    Plaintiff's data and Private Information has economic value. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients.

123.    Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is due to increase; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

124.    In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, Time Magazine described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[46]

125.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[47]

---

[46] *See* Adam Tanner, How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.
[47] *See* Christina Farr, Hospital Execs Say They are Getting Flooded with Requests for Your Health Data, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

## **TOLLING, CONCEALMENT, AND ESTOPPEL**

126.    The applicable statutes of limitation have been tolled as a result of UHI's knowing and active concealment and denial of the facts alleged herein.

127.    UHI seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing users with no indication that their Website usage was being tracked and transmitted to third parties. UHI knew that its Website incorporated Meta Pixel and other trackers, yet it failed to disclose to Plaintiff and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, and likely other third parties, including Google, Microsoft, StackAdapt, and CallRail.

128.    Plaintiff and Class Members could not with due diligence have discovered the full scope of UHI's conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel or any other tracking technology.

129.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. UHI's illegal interception and disclosure of Plaintiff's Private Information has continued unabated through at least April 3, 2023. What's more, UHI was under a duty to disclose the nature and significance of their data collection practices but did not do so. UHI is therefore estopped from relying on any statute of limitations defenses.

### **CLASS ALLEGATIONS**

130.    Plaintiff brings this nationwide class action on behalf of herself and on behalf of other similarly situated persons.

131.    The Class that Plaintiff seeks to represent is defined as follows:

**All persons whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

132.    Excluded from the Class are the following individuals and/or entities: Defendant

and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

133. Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

134. <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly used or disclosed by Defendant, and the Class is identifiable within Defendant's records.

135. <u>Commonality</u>: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include

    a. whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' Private Information;

    b. whether Defendant had duties not to disclose the Plaintiff's and Class Members' Private Information to unauthorized third parties;

    c. whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for non-healthcare purposes;

    d. whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for unauthorized purposes;

    e. whether Defendant failed to adequately safeguard Plaintiff's and Class Members'

Private Information;

f.   whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g.   whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h.   whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;

i.   whether Defendant engaged in unfair, unlawful, or deceptive practices by misrepresenting that it would safeguard Plaintiff's and Class Members' Private Information.

136.   <u>Typicality</u>: Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use and incorporation of Meta Pixel and other tracking technology.

137.   <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

138.   <u>Adequacy</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic

to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered is typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

139.    <u>Superiority and Manageability</u>: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

140.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions

would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

141. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

142. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

143. Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure and failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Member, and Defendant may continue to act unlawfully as set forth in this Complaint.

144. Further, Defendant has acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

145. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

     a.  whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

     b.  whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.  whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

d.  whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e.  whether Defendant breached the implied contract;

f.  whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been used and disclosed to third parties;

g.  whether Defendant failed to implement and maintain reasonable security procedures and practices;

h.  whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' Private Information; and

i.  whether Plaintiff and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
## NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

146.  Plaintiff realleges and incorporates the above allegations as if fully set forth herein.

147.  Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

148.  Defendant acted with wanton and reckless disregard for the privacy and

confidentiality of Plaintiff's and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

149.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiff's and Class Members' Private Information.

150.    Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.

151.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiff and Class Members. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

152.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

153.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their

Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's negligence. These injuries are ongoing, imminent, immediate, and continuing.

## COUNT II
## INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Class)

154.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

155.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and Online Platforms and the communications platforms and services therein.

156.    Plaintiff and Class Members communicated sensitive PHI and PII—Private Information—that they intended for only Defendant to receive and that they understood Defendant would keep private.

157.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion and their private affairs and concerns.

158.    Plaintiff and Class Members reasonably expected that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of PHI coupled with PII is highly offensive to the reasonable person.

159.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

160.    Plaintiff and Class Members have been damaged as a direct and proximate result

of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

161.    Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiff's and Class Members' privacy.

162.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

163.    Plaintiff also seeks such other relief as the Court may deem just and proper.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Class)

164.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

165.    A relationship existed between Plaintiff and the Class, on the one hand, and Defendant, on the other, in which Plaintiff and the Class put their trust in Defendant to protect the Private Information of Plaintiff and the Class, and Defendant accepted that trust.

166.    Defendant breached the fiduciary duty that it owed to Plaintiff and the Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, their Private Information.

167.    Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damage to Plaintiff and the Class.

168.    But for Defendant's breach of fiduciary duty, the injury-in-fact and damage to

Plaintiff and the Class would not have occurred.

169.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to the Plaintiff and the Class.

170.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

<u>COUNT IV</u>
**VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT**
**(On Behalf of Plaintiff and the Class)**

171.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

172.    The purposes and policies of the Indiana Deceptive Consumer Sales Act (the "DCSA"), Indiana Code § 24-5-0.5-1 to -12, are to:

(1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices;
(2) protect consumers from suppliers who commit deceptive and unconscionable consumer sales practices; and
(3) encourage the development of fair consumer sales practice.

Ind. Code § 24-5-0.5-1(b).

173.    The General Assembly has instructed courts to construe the DCSA liberally to promote these purposes and policies. Ind. Code § 24-5-0.5-1(a)

174.    UHI is a "supplier" as defined in the DCSA because it is a seller or other person who regularly engages in or solicits consumer transactions, which are defined to include sales of personal property, *services*, and intangibles that are primarily for a personal, familial, or household purpose, such as those at issue in this action. Ind. Code § 24-5-0.5-2(1), (3) (emphasis added).

175.    The DCSA provides that "[a] supplier may not commit an unfair, abusive, or

deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of [the DCSA] whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a).

176.    An "incurable deceptive act" is a "deceptive act done by a supplier as part of a scheme, artifice, or device with the intent to defraud or mislead. Ind. Code § 24-5-0.5-2(a)(8).

177.    The DCSA further provides:

Without limiting the scope of subsection (a) the following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts:
   a. That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have
   b. That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not . . . .

Ind. Code § 24-5-0.5-3

178.    UHI committed deceptive acts, including but not limited to the following.

   a. Encouraging patients to use UHI's Online Platforms while failing to represent the material fact that it discloses patients' Private Information to Facebook and potentially other third parties, without authorization or permission.

   b. Encouraging patients to use UHI's Online Platforms while failing to represent the material fact that it uses patients' Private Information, without their authorization for marketing purposes and to increase its revenue.

   c. Marketing itself as a trusted healthcare provider while failing to adhere to data privacy standards that govern health care providers, including federal law and regulations, industry standards, and the fiduciary duties that apply to health care

providers.

      d.  By installing and implementing the Meta Pixel, Defendant knew or reasonably should have known it intercepted and transmitted Plaintiff's and Class Member's communications from Plaintiff's and Class Members' browsers directly to Facebook. Likewise, by installing or implementing CAPI, Defendant knew or reasonably should have known that it recorded on its servers and transmitted to Facebook Plaintiff's and Class Member's confidential communications.

179.    UHI's violations were willful and were done as part of a scheme, artifice, or device with intent to defraud or mislead, and therefore are incurable deceptive acts under the DCSA.

180.    The DCSA provides that "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater. The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (i) three (3) times the actual damages of the consumer suffering the loss; or (ii) one thousand dollars ($1,000). Ind. Code § 24-5-0.5-4(a).

181.    The DCSA provides that "[a]ny person who is entitled to bring an action under subsection (a) on the person's own behalf against a supplier for damages for a deceptive act may bring a class action against such supplier on behalf of any class of persons of which that person is a member . . . ." Ind. Code § 24-5-0.5-4(b).

182.    Had Plaintiff and Class Members been aware that their Private Information would be transmitted to unauthorized third parties, they would not have entered into such transactions and would not have provided payment or confidential medical information to UHI.

183.    As a direct and proximate result of Defendant's unfair and deceptive acts and

practices in violation of the DCSA, Plaintiff and Class Members have suffered damages for which

Defendant is liable.

184.    Plaintiff and Class Members seek actual damages plus interest on damages at the

legal rate, as well as all other just and proper relief afforded by the DCSA. As redress for

Defendant's repeated and ongoing violations, Plaintiff and Class Members are entitled to, *inter*

*alia*, actual damages, treble damages, attorneys' fees, and injunctive relief.

**COUNT VI**
**Violation of the Indiana Wiretapping Act**
**(On Behalf of Plaintiff and the Class)**

185.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth

herein.

186.    The Indiana Wiretapping Act (the "IWA") states that "a person who knowingly or

intentionally intercepts a communication in violation of this article commits unlawful interception,

a Level 5 felony." Ind. Code § 35-33.5-5-5. The term "includes the intentional recording or

acquisition of communication through the use of a computer[.]"  *Id.*

187.    For purposes of the IWA, "interception" is the "intentional recording or acquisition

of the contents of an electronic communication by a person other than a sender or receiver of that

communication, without the consent of the sender or receiver, by means of any instrument, device,

or equipment under this article." Ind. Code § 35-31.5-2-176.

188.    Defendant UHI intentionally recorded and/or acquired Plaintiff and Class

Members' electronic communications, without the consent of the Plaintiff and Class Members,

using the Meta Pixel and other trackers.

189.    Defendant intentionally recorded and/or acquired Plaintiff's and Class Members'

electronic communications for the purpose of disclosing those communications to third parties,

including Facebook, without the knowledge, consent, or written authorization of Plaintiff or Class Members.

190.     Under the IWA, "[a] person whose communications are intercepted, disclosed, or used in violation of this article . . . has a civil cause of action against a person who intercepts, discloses, uses, or procures another person to intercept, disclose, or use a communication," and is entitled to recover from that person

    a.  the greater of:
        i.  actual damages;
        ii.  liquidated damages computed at a rate of one hundred dollars ($100) each day for each day of violation; or
        iii.  one thousand dollars ($1,000).
    b.  court costs (including fees).
    c.  punitive damages, when determined to be appropriate by the court.
    d.  reasonable attorney's fees.

Indiana Code § 35-33.5-5-4.

191.     UHI is a "person" under the IWA.  Ind. Code § 35-31.5-2-234.

192.     The devices used in this case, include, but are not limited to

    a.  those to which Plaintiff's and Class Members' communications were disclosed;

    b.  Plaintiff's and Class Members' personal computing devices;

    c.  Plaintiff's and Class Members' web browsers;

    d.  Plaintiff's and Class Members' browser-managed files;

    e.  the Meta Pixel;

    f.  internet cookies;

    g.  other pixels, trackers, and/or tracking technology installed on Defendant's Website and/or server;

    h.  Defendant's computer servers;

    i.  third-party source code utilized by Defendant; and

j.   computer servers of third parties (including Facebook).

193.   Defendant aided in the interception of communications between Plaintiff and Class Members and Defendant that were redirected to and recorded by third parties without the Plaintiff's or Class Members' consent.

194.   Under the IWA, Plaintiff and the Class Members are entitled to recover actual damages, but not less than liquidated damages at a rate of $100 a day for each day of the violation or one thousand dollars ($1,000), whichever is greater, punitive damages, reasonable attorney's fees, and court costs.

195.   In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members the following damages.

a.   Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private.

b.   Defendant eroded the essential confidential nature of the doctor-patient relationship.

c.   Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

d.   Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality.

e.   Defendant's actions diminished the value of Plaintiff's and Class Members' personal information.

196.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Jane Doe, Individually, and on behalf of all others similarly situated, prays for judgment as follows:

A.    for an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B.    for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.    for equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and unlawfully disclosed to third parties;

D.    for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.    an order Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

F.    an Order requiring Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

G.    for an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

43

H.      for an award of punitive damages, as allowable by law;

I.      for an award of attorneys' fees under the IWA, DCSA, the common fund doctrine, and any other applicable law;

J.      costs and any other expenses, including expert witness fees incurred by Plaintiff in connection with this action;

K.      pre- and post-judgment interest on any amounts awarded; and

L.      such other and further relief as this court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, by counsel, hereby demands a trial by jury on all issues so triable.

Dated: July 20, 2023                    Respectfully submitted,

_____*/s/ Lynn A. Toops*_____
Lynn A. Toops (No. 26386-49)
Mary Kate Dugan (No. 37623-49)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
mdugan@cohenandmalad.com

J. Gerard Stranch, IV (*Pro Hac Vice* forthcoming)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703

(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com
raina@turkestrauss.com

***Counsel for Plaintiff and the Proposed Class***