## IN THE UNITED STATE DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| | ) | |
| **JANE DOE, Individually, and on behalf of** | ) | |
| **all others similarly situated,** | ) | |
| | ) | |
| **Plaintiff** | ) | Case No. 1:23-cv-1261-RLY-CSW |
| | ) | |
| **v.** | ) | HON. RICHARD L. YOUNG |
| | ) | |
| **UPPERLINE HEALTH, INC. d/b/a** | ) | MAGISTRATE JUDGE CRYSTAL S. |
| **UPPERLINE HEALTH INDIANA,** | ) | WILDEMAN |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff, JANE DOE, Individually, and on behalf of all others similarly situated (hereinafter "Plaintiff" or "Ms. Doe") brings this Second Amended Class Action Complaint against Defendant, UPPERLINE HEALTH, INC. d/b/a UPPERLINE HEALTH INDIANA (hereinafter "Upperline" or "Defendant"), and alleges, upon personal knowledge as to her own actions, and upon information and belief as to all other matters, as follows:

### INTRODUCTION

1.     Plaintiff brings this class action to address Defendant's improper practice of disclosing the confidential Personally Identifying Information ("PII")[1] and/or Protected Health Information ("PHI")[2] (collectively referred to as "Private Information") of Plaintiff and the

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of

1

proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"),[3] and potentially others ("the Disclosure") via tracking technologies used on its website.

2.      The Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites or online platforms, such as Defendant's, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[4] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[5] OCR and FTC warn that "[i]mpermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss,

---

healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). Upperline is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

[3] Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. in October 2021. Plaintiff's reference to both "Facebook" and "Meta" throughout this complaint refer to the same company.
[4] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.
[5] *Id.*

discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[6]

3.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

4.      Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, <u>no health care provider may disclose a person's personally identifiable protected health information to a third party without express written authorization</u>.

5.      In December 2022, HHS released a bulletin on its website regarding the use of tracking technologies by entities covered by HIPAA—healthcare entities like Upperline —and its business associates (the "December 2022 Bulletin").[7]

---

[6] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf ), **attached as Exhibit A.**

[7] *See* archived version of the December 2022 Bulletin at *HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, HHS.gov (Dec. 1, 2022), https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 30, 2024).

6. Therein, HHS defined tracking technologies, explaining:

Tracking technologies are used to collect and analyze information about how users interact with regulated entities' websites or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.[8]

7. In the Bulletin, HHS was clear in unambiguous terms that, "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[9,10]

8. On March 18, 2024, HHS updated its December 2022 bulletin, "to increase clarity for regulated entities and the public" and reiterating the above basic privacy obligations.[11,12]

9. Upperline is a "[c]omprehensive [f]oot and [a]nkle care" provider that operates over a dozen podiatry clinics across the state of Indiana, Located in Anderson, Carmel, Columbus, Fishers, Franklin, Indianapolis, Jasper, Kokomo, Muncie, Noblesville, Richmond, Seymour, and

---

[8] *Id.*

[9] *Id.* (bold emphasis in original)

[10] Citing *to* 45 CFR 164.508(a)(3); s*ee also* 45 CFR 164.501 (definition of "Marketing").

[11] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022, updated Mar. 18, 2024), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

[12] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

Tipton.[13] Upperline describes itself as "offer[ing] the highest quality lower extremity care" and "strive[ing] to provide the most appropriate care based on [patients'] unique needs."[14]

10.    Despite its unique position as a trusted healthcare provider, Upperline knowingly configured and implemented into its website, https://www.upperlinehealthindiana.com/,[15] (the "Website")  devices known as "trackers" or "tracking technologies," which collected and transmitted patients' Private Information to Facebook, Google, and other third parties, without patients' knowledge or authorization.

11.    Defendant encouraged its patients to use its Website and its various web-based tools (collectively referred to as "Online Platforms") to access its patient portal, pay bills, complete new patient paper work, view its offered services, find a doctor, find a location, and more. Plaintiff and the Class Members visited Defendant's Online Platforms in relation to their past, present, and future health, healthcare and/or payment for health care.

12.    When Plaintiff and Class Members used Defendant's Website and Online Platforms, they thought they were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded trackers from Microsoft Universal Event Tracking ("Microsoft"), StackAdapt, Google Analytics with Google Tag Manager ("GTM") (collectively, "Google"), Facebook Events ("Facebook"), and CallRail into its Website and Online Platforms, surreptitiously forcing Plaintiff and Class Members to transmit intimate details about their medical treatment to third parties without their consent.

---

[13] *See* UPPERLINE HEALTH INDIANA, http://www.upperlinehealthindiana.com (April 3, 2023) (archived at https://web.archive.org/web/20230403185108/https://www.upperlinehealthindiana.com/); *see also* Find a Location, UPPERLINE HEALTH, https://upperlinehealth.com/find-location/ (search "Indiana") (last visited October 18, 2024).
[14] UPPERLINE HEALTH INDIANA, http://www.upperlinehealthindiana.com (April 3, 2023) (archived at https://web.archive.org/web/20230403185108/https://www.upperlinehealthindiana.com/).
[15] Upperline removed its Indiana-focused website sometime after April 3, 2023. The URL, http://www.upperlinehealthindiana.com, now redirects to http://www.upperlinehealth.com.

13.    A tracker (also referred to as "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[16] When a person visits a website with an tracker, it tracks "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[17] Then, the tracker transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[18]

14.    Among the trackers Defendant embedded into its Website is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information about a website user's device and the URLs and domains they visit.[19] When configured to do so, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[20] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[21]

15.    Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiff and Class Members' private health information, alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to

---

[16] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/
[17] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking
[18] *Id.*
[19] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started
[20] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.
[21] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/

disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

16.     Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiff and Class Members' sensitive and private health information, alongside identifiable information about them, to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiff and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

17.     Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI") alongside use of the Meta Pixel.[22]

18.     Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interactions from the website owner's private servers, which transmits the data directly to Facebook, without involvement from the website user's browser.[23, 24]

19.     Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from

---

[22] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/

[23] What is the Facebook Conversion API and How to Use It, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/

[24] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." Conversions API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api

sending website users' Private Information to Facebook directly. For this reason, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[25]

20.     Defendant utilized data from these trackers to market its services and bolster its profits. Facebook utilizes data from the Meta Pixel and CAPI to build data profiles for the purpose of creating targeted online advertisements and enhanced marketing services, which it sells for profit.

21.     The information that Defendant's Meta Pixel and CAPI sent to Facebook included Private Information that Plaintiff and Class Members submitted to Defendant's Website contained in the terms they searched, the pages they visited, and the buttons that they clicked.

22.     Such information allows third parties (e.g., Facebook) to learn an individual's health conditions and the medical care he or she seeks. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers, who then target Plaintiff and Class Members with online advertisements, based on the information they communicated to Defendant via the Website. Facebook and any third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

23.     In addition to the Facebook Pixel, and likely CAPI, on information and belief, Defendant installed other tracking technologies, Microsoft, StackAdapt, Google, and CallRail, which operate similarly to the Meta Pixel and transmitted Plaintiff's and Class Members' Private Information to unauthorized third parties.

---

[25] About Conversions API, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965

24.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send their private health information to a hidden third party—let alone Facebook, a company with a sordid history of violating consumer privacy in pursuit of ever-increasing advertising revenue.

25.     Neither Plaintiff nor any Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or any other third parties uninvolved in their treatment.

26.     Despite willfully and intentionally incorporating the Meta Pixel, potentially CAPI, and other third-party trackers into its Website and servers, Upperline did not disclose to Plaintiff or Class Members that it was sharing their sensitive and confidential communications and Private Information with third parties including Facebook, Google, Microsoft, StackAdapt, and CallRail.

27.     Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant.

28.     Defendant owed common law, statutory, and regulatory duties to keep Plaintiff's and Class Members' communications and Private Information safe, secure, and confidential.

29.     Upon information and belief, Upperline utilized the Meta Pixel and other tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

30.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard their information from unauthorized disclosure.

31.     Defendant breached its statutory and common law obligations to Plaintiff and Class

Members by, *inter alia*: (i) failing to adequately review its marketing programs and web-based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share patient information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook and others; (v) failing to protect Private Information and take steps to block the transmission of Plaintiff's and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

32.     Plaintiff seeks to remedy these harms and bring causes of action for (I) Negligence; (II) Negligence *Per Se*; (III) Invasion of Privacy – Intrusion upon Seclusion; (IV) Invasion of Privacy – Disclosure of Private Facts; (V) Breach of Implied Contract; (VI) Unjust Enrichment; (VII) Bailment; (VIII) Violation of the Indiana Deceptive Consumer Sales Act; (IX) Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), *et seq.;* (X) Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(3)(a) ("Unauthorized Divulgence By Electronic Communications Service"); (XI) Violation of Title II of the Electronic Communications Privacy Act*,* 18 U.S.C. § 2702, *et seq*.; and (XII) Violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*

**PARTIES**

33.     Plaintiff Jane Doe is a natural person and a resident and citizen of Indiana, where she intends to remain, with a principal residence in Kokomo, Howard County. She is a former patient of Upperline's Kokomo clinic, located at 2130 West Sycamore Street, Suite 150, Kokomo,

Indiana 46901. Ms. Doe is a victim of Defendant's unauthorized Disclosure of Private Information.

34.    Defendant, Upperline Health, Inc. d/b/a Upperline Health Indiana ("Upperline" or "Defendant"), is a for-profit corporation organized in Delaware with its principal place of business at 4101 Charlotte Avenue, Nashville, Tennessee 37209. It operates around fourteen clinics in the State of Indiana, located in the municipalities of Anderson, Carmel, Columbus, Fishers, Franklin, Indianapolis, Jasper, Kokomo, Muncie, Noblesville, Richmond, Seymour, and Tipton, Indiana.

## JURISDICTION AND VENUE

35.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (1) there are more than one hundred Class Members; (2) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (3) at least one member of the proposed Class is a citizen of a different state than Defendants.

36.    This Court has personal jurisdiction over Upperline because Upperline has purposefully established sufficient minimum contacts with the state of Indiana by doing business in this state, operating in over a dozen locations in Indiana, marketing itself to Indiana residents, and providing services to Indiana residents, including to Plaintiff. Moreover, Plaintiff's claims bear a close relationship with Defendant's contacts with the state and arise out of those contacts. By doing business in the state of Indiana, Upperline has purposefully availed itself of the forum, and the possibility of Upperline being haled into court was foreseeable.

37.    The Court has supplemental jurisdiction over Plaintiff's claims arising under state law under 28 U.S.C. § 1367.

38.    Venue properly lies in this district pursuant because a substantial part of the events and/or omissions giving rise to the claims occurred within this district under 28 U.S.C. § 1391(b)(2) and because Upperline is a resident of Indiana for the purposes of venue under 28

U.S.C. § 1391(c)(2).

## COMMON FACTUAL ALLEGATIONS

### A. Background

39.    Upperline operates a for-profit network of podiatry clinics with over a dozen locations spread across the state of Indiana, including in Anderson, Carmel, Columbus, Fishers, Indianapolis (two locations), Jasper, Kokomo, Muncie, New Castle, Noblesville, Richmond, Seymour, and Tipton.[26]

40.    Defendant promotes the convenience and comprehensive functionality of its Online Platforms, which it encourages patients to use to access its patient portal, pay bills, submit new patient paperwork, learn about its offered services, find a doctor, find a location, and more. It promotes the comprehensive functionality of these tools and promotes their use, in service of its own goal of increasing profitability.

41.    In furtherance of that goal, Defendant purposely installed the Meta Pixel and other trackers onto its Website, for the purpose of gathering information about Plaintiff and Class Members to further its marketing efforts. But Defendant did not only generate information for its own use: it also shared patient information, including Private Information belonging to Plaintiff and Class Members, with unauthorized third parties, including Facebook, Google, Microsoft, StackAdapt, and CallRail.

42.    To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.

### i.    Facebook's Business Tools and the Meta Pixel

---

[26] UPPERLINE HEALTH INDIANA, http://www.upperlinehealthindiana.com (April 3, 2023) (archived at https://web.archive.org/web/20230403185108/https://www.upperlinehealthindiana.com/); *see also* Find a Location, UPPERLINE HEALTH, https://upperlinehealth.com/find-location/ (search "Indiana") (last visited October 18, 2024).

12

43. Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[27]

44. In conjunction with its advertising business, Facebook encourages and promotes its "Business Tools" to be used to gather customer data, identify customers and potential customers, target advertisements to those individuals, and market products and services.

45. Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

46. The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, clicks a button, fills out a form, and more.[28] Businesses that want to target customers and advertise their services can also create their own tracking parameters by building a "custom event."[29]

47. The Meta Pixel is a Business Tool used to "track[] the people and type of actions they take" on an website.[30] When an individual accesses a webpage containing the Meta Pixel, the communications with that webpage are instantaneously and surreptitiously duplicated and sent to Facebook, traveling directly from the user's browser to Facebook's server, based off instructions from the Meta Pixel.

---

[27] Meta Reports Fourth Quarter and Full Year 2021 Results, FACEBOOK https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022).
[28] Specifications for Facebook Pixel Standard Events, META, https://www.facebook.com/business/help/402791146561655 (last visited Jan. 31, 2023); see also Facebook Pixel, Accurate Event Tracking, Advanced, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; see also Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; App Events API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Jan. 31, 2023).
[29] About Standard and Custom Website Events, META, https://www.facebook.com/business/help/964258670337005; see also Facebook, App Events API, supra.
[30] Retargeting, META, https://www.facebook.com/business/goals/retargeting.

48.    Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy, such as a homepage, and disable it on pages that do implicate patient privacy.

49.    The Meta Pixel's primary purpose is to enhance online marketing, improve online ad targeting, and generate sales.[31].

50.    Facebook's own website informs companies that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[32]

51.    According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** [Emphasis added.]

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[33]

52.    Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your

---

[31] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).

[32] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).

[33] Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).

website.

- **Drive more sales**. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[34]

53. Facebook likewise benefits from Meta Pixel data and uses it to enhance its own ad targeting abilities.

**ii.    Defendant's Method of Transmitting Plaintiff's and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel**

54. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

55. Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

56. Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[35]

57. GET Requests are one of the most common types of HTTP Requests.  In addition

---

[34] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).

[35] "Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

58.    When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information. The entity's servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

59.    Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

60.    Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

61.    In this way, the Meta Pixel acts much like a traditional wiretap: intercepting and transmitting communications intended only for the website host and diverting them to Facebook.

62.    Separate from the Meta Pixel, third parties place cookies in the browsers of web users. These cookies can uniquely identify the user, allowing the third party to track the user as the browse the internet—on the third-party site and beyond. Facebook uses its own cookie to identify users of a Meta-Pixel-enabled website and connect their activities on that site to their individual identity. As a result, when a Facebook account holder uses a website with the Meta Pixel, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the user associated with the information it has intercepted.

16

63.    With substantial work and technical know-how, internet users can sometimes circumvent these browser-based wiretap technologies. To counteract this, third parties bent on gathering data implement workarounds that are difficult for web users to detect or evade. Facebook's workaround is Conversions API, which "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."[36] This makes Conversions API a particularly effective tool because it allows sends Facebook data directly from the website server to Facebook, without relying on the user's web browser. Notably, client devices do not have access to host servers containing Conversions API, and thus, they cannot prevent (or even detect) this transmission of information to Facebook.

64.    While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the website server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with Facebook] that the pixel may lose."[37]  Consequently, if a website owner utilizes the Meta Pixel on its website, it is also reasonable to infer that it implemented the Conversions API on its website server(s), in accordance with Facebook's documentation.

65.    The Meta Pixel, Conversions API, and other third-party trackers do not provide any substantive content on the host website. Rather, their only purpose is to collect information to be used for marketing and sales purposes.

66.    Accordingly, without any knowledge, authorization, or action by a user, a website owner can use its website source code to commandeer its users' computing devices and web

---

[36] About Conversions API, META, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).
[37] See Best Practices for Conversions API, META, https://www.facebook.com/business/help/308855623839366 (last visited May 15, 2023).

17

browsers, causing them to invisibly re-direct the users' communications to Facebook, Google, Microsoft, StackAdapt, CallRail, and possibly others.

67.    In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

68.    Consequently, when Plaintiff and Class Members visited Defendant's Website and communicated their Private Information, it was simultaneously intercepted and transmitted to Facebook.

69.    Upperline also employed other trackers, including Facebook Events, Google Analytics with Google Tag Manager, Microsoft Universal Event Tracking, StackAdapt, and CallRail, which, on information and belief, Defendant likewise transmitted Plaintiff's and the Class Members' Private Information to these third parties without Plaintiff's and Class Members' knowledge or authorization.

### iii.    Defendant Deceived Class Members by Failing to Disclose that it Collects and Shares the Private Information of Patients Who Use its Website

70.    Although Upperline regularly disclosed its patients' Private Information to Facebook, Google, Microsoft, StackAdapt, and CallRail, it never informed Plaintiff or Class Members that their communications with their health care provider on Defendant's Website and Online Platforms were not confidential and would be used and disclosed for marketing purposes.

71.    At all times relevant to this complaint, Upperline did not provide a written Privacy Policy or Notice of Privacy Practices to users of its Website or otherwise notify Website users of its privacy policies and practices.[38]

---

[38] As of May 2, 2024, after the initial filing of this lawsuit, Defendant implemented a Privacy Policy on its Website. The Privacy Policy can be accessed here:  https://upperlinehealth.com/privacy-policy/ (last accessed Oct. 18, 2024).

72.     Nowhere on the Website does Upperline disclose its use of the Meta Pixel or other tracking technologies, which disclosed information about Plaintiff and Class Members to unauthorized third parties and for marketing purposes.

73.     Furthermore, Upperline provided Plaintiff and Class Members' Private Information to third parties, including Facebook and Google, in exchange for valuable consideration, such as enhanced marketing services.

> iv.    **Defendant Disclosed its Patients' Status as Patients, General Research Activities, Health Concerns, and Inquiries into Treatment Options to Facebook**

74.     Defendant had the Meta Pixel installed on its Website from at least January 28, 2021 through at least April 3, 2023.

75.     The Upperline website had one Pixel which was configured to track SubscribedButtonClick, Microdata, and PageView events. Through these Meta Pixel events, Upperline shared information with Facebook about patients': (i) status as patients; (ii) general research activities; and (ii) health concerns and inquiry into treatment options.

## Upperline Disclosed its Patients' Status as Patients

76.     Upperline shared information about patients' status as patients through its transmission of SubscribedButtonClick events. The SubscribedButtonClick events that Upperline sent included descriptions of patients' clicks on Upperline's website. Certain patient actions on Upperline's website would have indicated a patient's status as an existing patient, a new patient, or a potential patient with the intent in seeking care.

77.     Some examples of actions that would indicate a patient's status as a new patient is when an existing patient used Upperline's website to log onto their patient portal, pay their bills, or provide a patient referral.

78.     As a patient clicked to perform each one of such actions, Upperline would send Facebook a SubscribedButtonClick event, divulging that the patient clicked a button labeled, "Patient Portal Login," "Pay My Bill," or "Submit a Patient Referral," respectively. A patient could access each of these buttons by clicking "Patients" which would have led Upperline to send a SubscribedButtonClick event revealing that the patient clicked a button labeled "Patients."

79.     New patients could also use Upperline's website too. One example of a patient's action on the website that would have indicated their status as a new patient is when they clicked for Upperline's new patient paperwork. As a patient did so, Upperline would send a SubscribedButtonClick event reporting that the patient clicked a button labeled "New Patient Paperwork" divulging the patient's status as a new patient.

80.     Patients could also request an appointment on Upperline's website. This type of action would trigger Upperline to send SubscribedButtonClick event that reveals the patient is either a new or existing patient seeking to obtain care. Upon a patient's click to request an appointment, Upperline would send a SubscribedButtonClick event reporting to Facebook that the patient clicked a button labeled, "Schedule an Appointment" which leads to another page for an "appointment-request."

81.     Therefore, certain of patients' clicks on the Upperline's website were self-labeling actions which revealed patients' status as patients. By sending SubscribedButtonClick events with details about these labeled actions to Facebook, Upperline disclosed patients' patient status to Facebook.

### Upperline Disclosed its Patients' General Research Activities

82.     Patients could also use Upperline's website to perform more generalized research such as reviewing Upperline's doctors, searching for Upperline's services, and browsing Upperline

locations.

83.     Upperline sent a SubscribedButtonClick event to Facebook as a patient clicked for each of such resource disclosing the patient's research activities by sharing the labels of the buttons that patients clicked.

84.     When a patient clicked to view Upperline's doctors or to find a doctor, for instance, the SubscribedButtonClick event for each action reveals that that the patient clicked a button labeled "Doctors" and "Find a Doctor," respectively.

### Upperline Disclosed its Patients' Health Concerns and Inquiries into Treatment Options

85.     In addition to using the Upperline website to conduct patient administrative tasks and general research, patients could also use the website to learn about their health concerns and treatment options for those concerns. As patients navigated throughout Upperline's website to do so, Upperline would disclose patients' patterns of navigation through a string of PageView, Microdata, and SubscribedButtonClick events, revealing their health concerns and when they sought medical treatment.

86.     For example, if a patient navigated to learn about toenail fungus and treatment options for toenail fungus, Upperline would disclose that to Facebook.

87.     As a patient loaded the page about remedies for toenail fungus, Upperline would send PageView and Microdata events to Facebook, informing Facebook that the patient was reading about "Top Home Remedies to Treat Toenail Fungus." Notably, Upperline programmed its website such that the Microdata event informed Facebook that: "When home remedies are ineffective, [the patient should] contact Upperline Foot and Ankle."

88.     If the patient then clicked to contact Upperline after reviewing this article, Upperline would inform Facebook about that too through a SubscribedButtonClick event. The

21

event discloses that while the patient was on the page for "Top Home Remedies to Treat Toenail Fungus," they clicked to "Contact Upperline Foot and Ankle" which leads to Upperline's Locations page.

89.    Once a patient was on the Locations page for a particular Upperline facility and clicked to schedule an appointment, Upperline would continue to send events apprising Facebook of the patient's activities. If the patient navigated to the page about Upperline's Muncie, Indiana location, for example, Upperline would transmit PageView and Microdata events informing Facebook that the patient was on the page about Upperline's "Muncie, IN Podiatry Center."

90.    Next, as the patient clicked to schedule an appointment at the Muncie Upperline Podiatry Center, Upperline would inform Facebook that the patient clicked a button labeled "Schedule an Appointment," which leads to the page, "https://www.upperlinehealthindiana.com/appointment-request." Additionally, Upperline would provide Facebook with the name of the physician that the patient clicked to learn about as well as the address that the patient clicked to for travel route directions.

91.    If the patient instead navigated to learn about laser therapy for toenail fungus, Upperline would likewise inform Facebook about this too. When a patient loaded the page to learn about the therapy, Upperline would send a set of PageView and Microdata events. The Microdata event informs Facebook that the patient was reading a page titled "What Are The Benefits of Laser Toenail Fungus Therapy?" Through this event, Upperline reports to Facebook that the patient could "[l]earn about the benefits of laser toenail fungus treatment when other options have not worked."

92.    If the patient clicked to learn more about the therapy treatment option, Upperline would inform Facebook about this as well by sending a SubscribedButtonClick event, as shown

below:



The event reports that the patient clicked the text, "Laser toenail fungus therapy is a top treatment option," which leads to another page about "toenail-fungus-treatment."

93.     Therefore, if a patient who was afflicted by toe nail fungus navigated Upperline's website to learn about the condition, treatment options, and to schedule an appointment, Upperline would track and disclose their browsing pattern through a series of Meta Pixel events, revealing to Facebook that the patient was concerned about toe nail fungus and that they sought medical

23

treatment for it.

94.    Toenail fungus was only one among a range of ailments that were presented on Upperline's website. Some of the other ailments include: skin cancer, hammer toe, ingrown toenails, diabetic foot issues such as ulcers, sports injuries, bunions, and arthritis. Just like how Upperline would have informed Facebook as patients navigated through Upperline's pages about toenail fungus, so too would Upperline about patients as they navigated pages about these other conditions.

### Upperline Disclosed its Patients' Patient Portal Tracking

95.    The present-day Upperline patient portal, at https://4399-3.portal.athenahealth.com/, currently installs the Amplitude tracker and likely previously installed Google Analytics as well.

96.    The first available archive of Upperline's patient portal is dated March 28, 2022 and included Amplitude:



97.     There is currently a webpage on Amplitude's website that describes its service for healthcare clients as HIPAA compliant. The earliest available archive of this page is dated August 5, 2023.  It is reasonable to believe Amplitude did not offer a HIPAA compliant solution at the time Upperline installed the Amplitude tracker.

98.     As of today, Upperline discloses to Amplitude when patients log in, complete the forgot password workflow, sign up for the patient portal, and click to pay bills.

99.     When patients navigate to the patient portal, Upperline sends Amplitude an event revealing the patient is viewing the "landing" page. On this page, patients can choose to log in, create an account, or pay a bill. Upperline discloses patient details to Amplitude as they perform each activity.

100.     When the patient clicks to log in, Upperline sends a "PortaLogin:Login" event to Amplitude. Then as the log in page loads, Upperline transmits a "Login:LandingSPA: event and a "'workflow_type': 'LOGIN'."

101.     Similarly, Upperline sends a "workflow: FORGOTPASSWORD" when a patient enters their email to recover a forgotten password. Note the event includes the patient's email in clear text.

102.     Upperline also discloses patients' information to Amplitude as patients sign up for the portal. First, Upperline transmits a "PortalLogin:SignUpToday" event when a patient clicks to create an account. Then when the patient selects whether they are the patient or a caregiver, Upperline discloses whether the patient is a patient via a Reg_RoleSection:PatientYN" event.

103.     Defendant could have chosen not to use the Meta Pixel, or it could have configured the Pixel to limit the information that it communicated to third parties. It did not. Instead, it intentionally took advantage of the Meta Pixel's features and functions, resulting in the Disclosure of Plaintiff's and Class Members' Private Information.

104.     Along those same lines, Defendant could have chosen not to use Facebook Events, Google Analytics with Google Tag Manager, Microsoft Universal Event Tracking, StackAdapt, and CallRail to record Plaintiff and Class Members private communications and transmit that information to unauthorized third parties. It did so anyway, intentionally taking advantage of these trackers, despite the harm to Plaintiff and Class Members' privacy.

105.    Defendant used and disclosed Plaintiff's and Class Members' Private Information to Facebook, Google, and possibly other third parties for the purpose of marketing its services and increasing its profits.

106.    On information and belief, Defendants shared, traded, or sold Plaintiff's and Class Members' Private Information with Facebook, and potentially other third parties, in exchange for improved targeting and marketing services.

107.    Plaintiff did not consent, agree, authorize, or otherwise permit Defendant to disclose their Private Information for marketing purposes. Defendant did not notify Plaintiff and Class Members of their practice of disclosing patients' Private Information to Facebook, Google, Microsoft, StackAdapt, and CallRail, nor did Defendant provide any means of opting out of these disclosures. Defendant, nonetheless, used Plaintiff and Class Members' Private Information and knowingly disclosed that Private Information to unauthorized entities for Defendant's own gain

108.    Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

109.    Defendant misrepresented that it would preserve the security and privacy of Plaintiff and Class Members' Private Information while knowingly disclosing their Private Information to unauthorized third parties.

110.    By law, Plaintiff and the Class Members are entitled to privacy in their Protected Health Information and confidential communications. Upperline deprived Plaintiff and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications, Personally Identifiable Information, and Protected Health Information; (2) disclosed patients' Private

27

Information to unauthorized, third-party eavesdroppers, including Facebook, Google, Microsoft, StackAdapt, CallRail, and possibly others; (3) profited from the Disclosure; and (4) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

### B. Plaintiff's Experience

111.    Plaintiff Jane Doe was a patient of Defendant from April to October 2022, during which time she was treated by Upperline physicians for podiatry and related surgery at Upperline's former Kokomo clinic located in Kokomo, Indiana.

112.    Plaintiff had a total of four surgeries with Upperline.

113.    As a patient of Defendant, Ms. Doe relied on Upperline's Website and Online Platforms to communicate confidential patient information. She accessed the Website and Online platforms somewhere between five and ten times during the months of April to October 2022. Specifically, Ms. Doe has used the Website to schedule appointments and find a podiatrist who could offer a second opinion regarding some previous surgical work. She has also used the Website to access Online Platforms such as the patient portal, where she looked up and downloaded her medical history.

114.    Ms. Doe's Upperline physician directed her to communicate with them via the website, rather than the patient portal. Ms. Doe complied with her doctor's request and used the website to communicate confidential information about herself and her health conditions and treatment.

115.    Plaintiff used the main website, not patient portal to schedule appointments. To correspond with her doctor, she would navigate to the location she has been seen at, clicked her doctor, and then clicked a button "Email your doctor" – this then took her to the patient portal to

message her doctor.

116.   Ms. Doe accessed Defendant's Website and Online Platforms at Defendant's direction and encouragement. Ms. Doe reasonably expected that her online communications with Upperline were confidential, solely between herself and Upperline, and that, as such, those communications would not be transmitted to or intercepted by a third party.

117.   Ms. Doe provided her Private Information to Defendant and trusted that the information would be safeguarded according to Upperline privacy policies and the law.

118.   Through its use of the Meta Pixel, Defendant disclosed to Facebook

   a.   Ms. Doe's identity;

   b.   Ms. Doe's status as a patient of Defendant;

   c.   Ms. Doe's seeking of medical treatment from Defendant;

   d.   Ms. Doe's health conditions and the treatment she sought; and

   e.   Ms. Doe's location.

119.   By failing to receive the requisite consent to disclose Ms. Doe's Private Information, Upperline violated its agreements with Ms. Doe, its own policies, and the law.

120.   Since using Defendant's Website, Ms. Doe has been targeted by health-related online advertisements.  Ms. Doe has received a significant amount of podiatry-related advertising. She has received ads for different clinics and doctors across the U.S. for podiatry services. Ms. Doe messaged her doctor multiple times regarding a medication (Dolobid) she was prescribed, by him, to which she had an anaphylactic reaction.  She saw advertising for this medication, as well as a lot of advertising for similar medications within the same class of drug.

121.   Plaintiffs has also seen advertising for EpiPens and different types of EpiPens. She has seen many different ads for pain medication.  Ms. Doe has even received a massive shipment

of braces and casts, with no return address, which she still has.  Since these occurrences, Ms. Doe has since done everything in her power to remain as private as possible on Facebook.

122.    Plaintiff paid for Defendant's healthcare services, which included reasonable privacy and data security protections for Ms. Doe's Private Information; however, Ms. Doe did not receive the privacy and security protections for which she paid.

123.    As described herein, by use of the Meta Pixel and tracking technology, Upperline sent Plaintiff's Private Information to Facebook and others when she used Defendant's Online Platforms to communicate healthcare and identifying information to Upperline.

124.    Ms. Doe first discovered that Defendant was using the Meta Pixel and other tracking technologies to gather and disclose her Private Information in October 2023.

125.    Pursuant to the process described herein, Upperline assisted Facebook and others with intercepting Plaintiff's confidential communications, including those that contained PII and PHI. Upperline facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization.

126.    Plaintiff never intended to sell her Private Information or would have permitted it to be made available for sale on the resale market.

127.    On information and belief, through its use of the Meta Pixel and other tracking technologies, Upperline disclosed to Facebook:

    a.   The pages and content Plaintiff viewed;

    b.   Plaintiff's seeking of medical treatment;

    c.   Plaintiff's status as a patient;

    d.   Information regarding Plaintiff's patient portal activity;

    e.   The specialties of the medical providers Plaintiff searched for and viewed;

f.  the names of the medical providers Plaintiff searched for and viewed;

g.  the search results that Plaintiff clicked on;

h.  the medical services Plaintiff viewed; and,

i.  Plaintiff's identity via her IP address and/or "c_user" cookie and/or Facebook ID.

128.  By failing to receive the requisite consent, Upperline breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

129.  As a result of Upperline's Disclosure of Plaintiff's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Plaintiff has suffered the following injuries:

a.  Loss of privacy; unauthorized disclosure of her Private Information; unauthorized access of her Private Information by third parties;

b.  Plaintiff now receives targeted health-related advertisements on Facebook, reflecting her private medical treatment information;

c.  Plaintiff paid Upperline for medical services and the services she paid for included reasonable privacy and data security protections for her Private Information, but Plaintiff did not receive the privacy and security protections for which she paid, due to Defendant's Disclosure;

d.  The portion of Upperline's revenues and profits attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;

e.  The portion of Upperline's savings in marketing costs attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;

f.  The portion of Upperline's revenues and profits attributable to serving and

monetizing advertisements directed to Plaintiff as a result of collecting Plaintiff's

Private Information without authorization and sharing it with third parties;

g.  Value to Plaintiff of surrendering her choice to keep her Private Information private

and allowing Upperline to track her data;

h.  Embarrassment, humiliation, frustration, and emotional distress;

i.  Decreased value of Plaintiff's Private Information;

j.  Lost benefit of the bargain;

k.  Increased risk of future harm resulting from future use and disclosure of her Private

Information; and

l.  Statutory damages.

**C.  Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI**

130.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[39] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

131.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data.  The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway.  The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on

---

[39] Kurt Wagner & Bloomberg, Facebook Admits Another Blunder with User Data, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.

this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."[40]

132.    The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling:  the company was sharing their data with Facebook.[41] When a user was having her period or informed the app of her intention to get pregnant, Flo would inform Facebook, which could then use the data for targeted advertising.  In 2021, Flo settled with the Federal Trade Commission for lying to its users about its secret sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[42]

133.    More recently, Facebook employees admitted to lax protections for sensitive user data.  In 2021, Facebook engineers on the ad business product team conceded "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[43]

134.    In June 2022, an investigation by The Markup[44] revealed that 33 of the top 100

---

[40] New York State Department of Financial Services, REPORT ON INVESTIGATION OF FACEBOOK INC. DATA PRIVACY CONCERNS, (Feb. 18, 2021)
https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.
[41] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.)
https://slate.com/technology/2022/06/health-data-brokers-privacy.html.
[42] Id.
[43] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.
[44] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. See www.themarkup.org/about (last accessed Mar. 19, 2023).

hospitals in the nation had the Meta Pixel embedded on their websites.[45] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data" including sensitive personal health information whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[46] The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."[47]

135.    During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites included patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, and patients' names, addresses, email addresses, and phone numbers.[48]

136.    In addition to the 33 hospitals identified by The Markup as having installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[49]

137.    David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated he was "deeply troubled" by what the hospitals capturing and sharing patient data in this way.[50]

### D.  Defendant Violated HIPAA Standards

138.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-

---

[45] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[46] Id.
[47] Id.
[48] Id.
[49] Id.
[50] Id.

public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[51]

139.  Guidance from the U.S. Department of Health and Human Services ("HHS") instructs healthcare providers that patient status alone is protected by HIPAA.

140.  In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[52]

141.  In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[53]

142.  In addition, HHS's Office for Civil Rights (OCR) issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the

---

[51] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[52] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.
[53] U.S. Department of Health and Human Services, Marketing, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[54]

143.    According to the Bulletin, "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."[55]

144.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [56]

145.    In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel violates HIPAA Rules.

    **E.    Defendant Violated FTC Standards, and the FTC and HSS Take Action**

---

[54] *See* U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,
https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.
[55] *Id.*
[56] *Id.* (emphasis in original) (internal citations omitted).

146.    The Federal Trade Commission ("FTC") has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[57]

147.    On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[58]

148.    Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[59] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."[60]

149.    Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id*. According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or

---

[57]  Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **attached as Exhibit A.**

[58] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[59] *Id.*

[60] *Id.*

nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[61]

150.   Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[62]

151.   As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

### F.  Defendant Violated Industry Standards

152.   A medical provider's duty of confidentiality is a cardinal rule, embedded in doctor-patient and hospital-patient relationships.

153.   The American Medical Association's ("AMA") Code of Medical Ethics requires the protection of patient privacy and communications, and these rules are applicable to Upperline and its physicians.

154.   AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

---

[61] Statement of the Commission: On Breaches by Health Apps and Other Connected Devices, U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).

[62] *See, e.g.,* U.S. v. Easy Healthcare Corp., Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legallibrary/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; In the Matter of BetterHelp, Inc., FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; U.S. v. GoodRx Holdings, Inc., Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; In the Matter of Flo Health Inc., FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/casesproceedings/192-3133-flo-health-inc.

155.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

156.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

## G.  Plaintiff's and Class Members' Expectation of Privacy

157.    At all times when Plaintiff and Class Members provided their Private Information to Defendant, they had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

## H.  IP Addresses are Personally Identifiable Information

158.    Defendant also disclosed Plaintiff's and Class Members' IP addresses to Facebook, Google, Microsoft, StackAdapt, and CallRail through its use of the Meta Pixel and other tracking technologies.

159.    An IP address is a number that identifies the address of a device connected to the Internet.

160.    IP addresses are used to identify and route communications on the Internet.

161.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party trackers to facilitate and track Internet communications.

162.    Facebook tracks every IP address ever associated with a Facebook user.

163.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

164.    Under HIPAA, an IP address is Personally Identifiable Information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code," specifically listing IP addresses as an example of PII.  *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

165.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

## I.  Defendant Was Enriched by and Benefitted from the Use of Plaintiff and Class Members' Private Information

166.    The sole purpose for Defendant's use of the Meta Pixel and other tracking technology was to enhance its marketing efforts and increase its profits.

167.    In exchange for disclosing the Private Information of its patients, Defendant was compensated by Facebook, Google, and likely others in the form of enhanced advertising services and more cost-efficient marketing.

168.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

169.    By utilizing the Meta Pixel and other trackers, the cost of advertising and

retarging was reduced, thereby benefiting Defendant.

**J. Plaintiff's and Class Members' Private Information Had Financial Value**

170.    The data concerning Plaintiff and Class Members, collected and shared by Defendant, has tremendous economic value. Data collected via the Meta Pixel, CAPI, and other online tracking tools allows Facebook to build its own massive, proprietary dataset, to which it then sells access in the form of targeted advertisements. Targeting works by allowing advertisers to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[63] Facebook's "Core Audiences" allow advertisers to target individuals based on demographics, such as age, location, gender, or language, whereas "Custom Audiences" allow advertisers to target individuals who have "already shown interest in your business," by visiting a business's website, using an app, or engaging in certain online content.[64] Facebook's "Lookalike Audiences" go further, targeting individuals who resemble current customer profiles and whom, according to Facebook, "are likely to be interested in your business."[65]

171.    Plaintiff had a recognizable property interest in her browsing history. That browsing history has economic value, and by sharing, or facilitating the sharing of, such information with third parties such as Google and Facebook without prior approval, Upperline took something of value from Plaintiff and provided it to third parties without compensating Plaintiff for the use of her Private Information and data, thus, causing the Plaintiff economic injury.

172.    Plaintiff's Private Information, which was taken by Defendant without permission,

---

[63] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).
[64] *Id.*
[65] *See* How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Center, https://www.facebook.com/business/help/465262276878947 (last visited Aug. 14, 2023).

had value even though it was not "for sale."  The browsing history and data mined from individuals using the internet has significant economic value.  If it did not have value, then entire industries that sell and trade this data would not exist.  There is an entire data industry and estimates suggest that that industry generates billions of dollars.

173.    Data harvesting is big business, and it drives Facebook's profit center, its advertising sales. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than 98% of its total revenue for that year.[66]

174.    This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

175.    In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, it described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[67]

176.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who

---

[66] *See* Here's How Big Facebook's Ad Business Really Is, CNN, https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html (last visited Aug. 14, 2023).
[67] *See* Adam Tanner, How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.

compile the data from providers and other health-care organizations and sell it to buyers."[68]

## TOLLING, CONCEALMENT, AND ESTOPPEL

177.    The applicable statutes of limitation have been tolled as a result of Upperline's knowing and active concealment and denial of the facts alleged herein.

178.    Upperline seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing users with no indication that their Website usage was being tracked and transmitted to third parties. Upperline knew that its Website incorporated Meta Pixel and other trackers, yet it failed to disclose to Plaintiff and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, Google, Microsoft, StackAdapt, and CallRail.

179.    Even while exercising due diligence, Plaintiff and Class Members could not have discovered the full scope of Upperline's conduct, because there were no disclosures or other indications that they were interacting with websites employing Meta Pixel or any other tracking technology.

180.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Upperline's illegal interception and disclosure of Plaintiff's Private Information has continued unabated through at least April 3, 2023. What's more, Upperline was under a duty to disclose the nature and significance of their data collection practices but did not do so. Upperline is therefore, is estopped from relying on any statute of limitations defenses.

---

[68] *See* Christina Farr, Hospital Execs Say They are Getting Flooded with Requests for Your Health Data, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

## CLASS ALLEGATIONS

181.    Plaintiff brings this nationwide class action on behalf of herself and on behalf of other similarly situated persons.

182.    The Class that Plaintiff seeks to represent is defined as follows:

**All patients of Defendant whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

183.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

184.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

185.    Numerosity: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly used or disclosed by Defendant, and the Class is identifiable within Defendant's records.

186.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).

187.    Numerosity: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose

Private Information may have been improperly accessed in the Disclosure, and each Class is apparently identifiable within Defendant's records.

188.    <u>Commonality</u>: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include

     a.  whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' Private Information;

     b.  whether Defendant had duties not to disclose the Plaintiff's and Class Members' Private Information to unauthorized third parties;

     c.  whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for non-healthcare purposes;

     d.  whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for unauthorized purposes;

     e.  whether Defendant failed to adequately Plaintiff's and Class Members' Private Information;

     f.  whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

     g.  whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

     h.  whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;

     i.  whether Defendant's conduct breached its duties of care and amounts to negligence;

     j.  whether Defendant was negligent *per se*;

45

k. whether Defendant committed invasion of privacy—intrusion upon seclusion;

l. whether Defendant committed invasion of privacy—public disclosure of private facts;

m. whether Defendant breached its implied contract with Plaintiff and the Class Members; or in the alternate, whether Defendant was unjustly enriched;

n. whether Defendant breached a bailment it had with Plaintiff and the Class Members;

o. whether Defendant's conduct violated the Indiana Deceptive Consumer Sales Act; Indiana Code § 24-5-0.5-1 *et seq.*;

p. whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), *et seq.*;

q. whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. § 2511(3)(a) ("Unauthorized Divulgence By Electronic Communications Service");

r. whether Defendant's conduct violated Title II of the Electronic Communications Privacy Act, 18 U.S.C. § 2702, *et seq.*;

s. whether Defendant's conduct violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*

t. whether Plaintiff and the Class Members are entitled to damages, including actual, compensatory, and nominal damages;

u. the measure of Plaintiff's and the Class Members' damages; and,

v. whether Plaintiff and the Class Members are entitled to punitive damages

189. <u>Typicality</u>: Plaintiff's claims are typical of those of other Class Members because

all had their Private Information compromised as a result of Defendant's use and incorporation of Meta Pixel and other tracking technology.

190.    Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

191.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered is typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

192.    Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for

those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

193.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

194.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

195.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

196.    Unless a Class-wide injunction is issued, Defendant may continue in their unlawful disclosure and failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding Disclosure, and Defendant may continue to act unlawfully as set forth in this Complaint.

197.   Further, Defendant have acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

198.   Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

    a.   whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    b.   whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c.   whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

    d.   whether Defendant was negligent and/or negligent *per se*;

    e.   whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that contract;

    f.   whether Defendant breached the contract;

    g.   in the alternate, whether Defendant was unjustly enriched;

    h.   whether Defendant breached a bailment it had with Plaintiff and the Class Members;

    i.   whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been used and disclosed to third parties;

    j.   whether Defendant failed to implement and maintain reasonable security

procedures and practices;

k.  whether Defendant invaded Plaintiff and the Class Members' privacy;

l.  whether Defendant violated the Indiana Deceptive Consumer Sales Act; Indiana Code § 24-5-0.5-1 *et seq.*;

m.  whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), *et seq.*;

n.  whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. § 2511(3)(a) ("Unauthorized Divulgence By Electronic Communications Service");

o.  whether Defendant's conduct violated Title II of the Electronic Communications Privacy Act, 18 U.S.C. § 2702, *et seq.*;

p.  whether Defendant's conduct violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*; and,

q.  whether Plaintiff and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

199.  Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

200.  Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that

50

occurred.

201.    Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

202.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiff's and Class Members' Private Information.

203.    Defendant's duty arose as a result of industry standards and the physician-patient relationship to keep patients' Private Information, PHI and PII of Plaintiff and the Class Members, gathered in that relationship secret; as well as due to Defendant collecting Private Information from patients online.

204.    Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.

205.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of Private Information of Plaintiff and Class Members, and by failing to disclose Defendant was gathering Private Information, including PHI and PII, and sharing it with third parties without authorization, beyond the scope of the physician-patient relationship.  This failure actually and proximately caused Plaintiff's and Class Members' injuries.

51

206.    As a direct, proximate, and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or imminently will suffer injury and damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

207.    Defendant's breach of its common-law duties to exercise reasonable care and negligence, directly and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their Private Information by third parties; improper disclosure of their Private Information; receipt of targeted advertisements reflecting private medical information; lost benefit of their bargain; lost value of their Private Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendant's negligence; value to Plaintiff and the Class Members of surrendering their choices to keep their Private Information private and allowing Defendant to track their data; increased risk of future harm resulting from future use and disclosure of Plaintiff's and the Class Members' Private Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.

208.    Moreover, Plaintiff's and the Class Members' foregoing personal injury and property damage was a sudden and dangerous occurrence because Plaintiff and the Class entrusted their Private Information to Defendant within the scope the physician-patient relationship with the expectation that information would be kept confidential, and yet Upperline suddenly, and without warning, disclosed that Private Information to others outside of the physician-patient relationship,

without Plaintiff's and the Class Members' knowledge, consent, or authorization.

209.    Defendant's negligence directly and proximately caused the unauthorized access and Disclosure of Plaintiff's and Class Members' Private Information, PII and PHI, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

210.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

## COUNT II
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

211.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

212.    Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), Defendant was required by law and industry standards to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' Private Information.

213.    Plaintiff and Class Members are within the class of persons that these statutes and rules were designed to protect.

214.    Defendant had a duty to have procedures in place to detect and prevent the loss or

unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

215.    Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

216.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiff's and Class Members' PII and PHI in compliance with applicable laws would result in an unauthorized third-parties such as Facebook, and others gaining access to Plaintiff's and Class Members' PII and PHI, and resulting in Defendant's liability under principles of negligence *per se*.

217.    Defendant violated its duty under Section 5 of the FTC Act and/or HIPAA and/or under Indiana law by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII and PHI and not complying with applicable industry standards as described in detail herein; as well as failing to disclose Defendant was gathering Private Information, including PHI and PII, and sharing it with third parties without authorization, beyond the scope of the physician-patient relationship.

218.    Plaintiff's and Class Member's PII and PHI constitute personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

219.    As a direct, proximate, and traceable result of Defendant's negligence *per se* and breach of duties as set forth above, Plaintiff and Class Members were caused to, *inter alia*, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which

there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

220.    Defendant's breach of its duties and negligence *per se*, directly and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their Private Information by third parties; improper disclosure of their Private Information; receipt of targeted advertisements reflecting private medical information; lost benefit of their bargain; lost value of their Private Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost use of their Private Information without compensation, and interference with their possession of their information; invasion of their privacy rights; lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendant's negligence *per se*; value to Plaintiff and the Class Members of surrendering their choices to keep their Private Information private and allowing Defendant to track their data; increased risk of future harm resulting from future use and disclosure of Plaintiff's and the Class Members' Private Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.

221.    Moreover, Plaintiff's and the Class Members' foregoing personal injury and property damage was a sudden and dangerous occurrence because Plaintiff and the Class entrusted their Private Information to Defendant within the scope the physician-patient relationship with the expectation that information would be kept confidential, and yet Upperline suddenly, and without warning, disclosed that Private Information to others outside of the physician-patient relationship, without Plaintiff's and the Class Members knowledge, consent, or authorization.

222.    Defendant's negligence *per se* directly and proximately caused the unauthorized

access and Disclosure of Plaintiffs' and Class Members' Private Information, PII and PHI, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

223.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's negligence *per se*, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**COUNT III**
**INVASION OF PRIVACY – INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiff and the Class)**

224.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

225.    Indiana recognizes the tort of invasion of privacy – intrusion upon seclusion.

226.    The tort of intrusion upon seclusion is defined as "intrusion upon the plaintiff's physical solitude or seclusion as by invading his home or conducting an illegal search." *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991).

227.    While using the Website, Plaintiff and Class Members communicated sensitive PHI and PII—Private Information—that they intended for only Defendant to receive and that they understood Defendant would keep private.

228.    Plaintiff and Class Members' PHI and PII—or what is otherwise referred to here as Private Information—is extremely private and not a matter of legitimate public interest.

229.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications over the Website.  Moreover, Plaintiff and Class Members have a general expectation of privacy in communicating with their health care provider about their health

conditions and treatment.

230. Plaintiff and Class Members reasonably expected that their private communications with the Website would not be tracked, surveilled, recorded, eavesdropped, or otherwise intruded upon, and that their confidential communications with their health care provider would remain private.

231. Defendant intentionally intruded upon Plaintiff and Class Members' privacy by secretly recording their usage of the Website, including the Private Information and confidential communications included therein.

232. Defendant's intrusion into Plaintiff and Class Member's confidential communications with their health care provider and secret recording of Private Information is highly offensive to the reasonable person.

233. As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

234. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

235. Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiff's and Class Members' privacy.

236. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

237.    Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT IV**
**INVASION OF PRIVACY – DISCLOSURE OF PRIVATE FACTS**
**(On Behalf of Plaintiff and the Class)**

238.    Indiana also recognizes the tort of invasion of privacy – disclosure of private facts.

239.    The tort of disclosure of private facts is defined as "(1) the information disclosed must be private in nature; (2) the disclosure must be made to the public; (3) the disclosure must be one that would be highly offensive to a reasonable person; and (4) the information disclosed is not of legitimate public concern." *Cmty. Health Network, Inc. v. McKenzie*, 185 N.E.3d 368, 382 (Ind. 2022).

240.    Plaintiff and Class Members' PHI and PII—or what is otherwise referred to here as Private Information—is extremely private and not a matter of legitimate public interest.

241.    The unauthorized disclosure of Private Information by a health care provider, such as Defendant, is highly offensive to a reasonable person.

242.    Defendant intentionally configured and installed tracking technologies on its Website, which it then used to record Plaintiff and Class Members' Private Information and disclose that Private Information to Facebook, Google, Microsoft, StackAdapt, and CallRail.

243.    By sharing Plaintiff and Class Members' Private Information with Facebook, Google, Microsoft, StackAdapt, and CallRail, Defendant gave publicity to the private lives of Plaintiff and Class Members.

244.    Defendant acted with a knowing state of mind when it used source code tools specifically designed to track and record patients' Private Information and disclose that Private Information to third parties.

245.    As a proximate result of Defendant's acts and omissions, Plaintiffs' and Class

Members' Private Information was disclosed to third parties—and is now available for further disclosure and redisclosure without authorization, further inflicting injuries on Plaintiffs and the Class.

246. As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

247. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

248. Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of Defendant's unlawful disclosure.

249. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

250. Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Class)**

251. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

252. As a condition of receiving medical care from Defendant, Plaintiff and the Class provided their Private Information and paid compensation for the treatment received.

253. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information

secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen. Implicit in the agreement between Defendant and its patients, Plaintiff and the proposed Class Members, was the obligation that both parties would maintain the Private Information confidentially and securely.

254.    Upperline had an implied duty of good faith to ensure that the Private Information of Plaintiff and Class Members in its possession was only used only as authorized, such as to provide medical treatment, billing, and other medical benefits from Defendant.

255.    Defendant had an implied duty to protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses.

256.    Additionally, Defendant implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

257.    Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant. Upperline did not. Plaintiff and Class Members would not have provided their confidential Private Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Private Information for uses other than receiving medical treatment from Defendant.

258.    Defendant breached the implied contracts with Plaintiff and Class members by disclosing Plaintiff's and Class Members' Private Information to unauthorized third parties, including Facebook, Google, and others.

259.    Defendant's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Private Information in exchange for medical treatment and benefits.

260.    As a direct and proximate result of Defendant's breach of contract, Plaintiff and the

60

Class have suffered (and will continue to suffer) injury-in-fact and damages, including monetary damages; loss of privacy; unauthorized disclosure of Private Information; unauthorized access to Private Information by third parties; use of the Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased value of Private Information; lost benefit of the bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of their information.

261.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

<b><u>COUNT VI</u></b><br><b>UNJUST ENRICHMENT</b><br><b>(On Behalf of Plaintiff and the Class)</b>

262.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

263.    This claim is pleaded in the alternative to Plaintiff's breach of implied contract claim.

264.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of valuable sensitive medical information—Private Information—that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, for marketing purposes, and for sale or trade with third parties.

265.    Plaintiff and Class Members would not have used Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Private Information to third parties.

266.    Defendant appreciated or had knowledge of the benefits conferred upon it by

Plaintiff and Class Members.

267.    As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy practices and procedures that Plaintiff and Class Members paid for, and those purchases with unreasonable data privacy practices and procedures that they received.

268.    The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members themselves. Under unjust enrichment principles, it would be inequitable for Defendant to retain the profit and/or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Petition.

269.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of the conduct and the unauthorized Disclosure alleged herein.

## COUNT VII
### BAILMENT
**(On Behalf of Plaintiff and the Class)**

270.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

271.    Plaintiff, the Class, and Defendant contemplated a mutual benefit bailment when Plaintiff and Class members transmitted their Private Information to Defendant solely for treatment and the payment thereof.

272.    Plaintiff's and the Class's Private Information was transmitted to Defendant in trust for a specific and sole purpose of receiving Upperline's medical treatment services, with an implied contract that the trust was to be faithfully executed, and the Private Information was to be accounted for when the special purpose was accomplished.

273.    Defendant was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiff's and the Class's Private Information.

274.    Plaintiff's and the Class's Private Information was used for a different purpose than the Plaintiff and the Class intended, for a longer time period and/or in a different manner or place than the parties intended. Instead of being used to facilitate their medical treatment, Plaintiff's and the Class Members' Private Information was used by Defendant to benefit Upperline and its marketing and advertising purposes.

275.    Defendant's breach of the bailment was a legal cause of injury-in-fact and damage to Plaintiff and the Class, including but not limited to, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, emotional distress and embarrassment and humiliation, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's tortious conduct. These injuries are ongoing, imminent, immediate, and continuing.

276.    As a direct and proximate result of Defendant's breach of the bailment, Plaintiff and Class Members are entitled to and do demand actual, compensatory, and punitive damages, as well as injunctive relief, and all other relief allowed by law.

## COUNT VIII
### VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
### (On Behalf of Plaintiff and the Class)

277.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

278.    The purposes and policies of the Indiana Deceptive Consumer Sales Act (the "DCSA"), Indiana Code § 24-5-0.5-1 to -12, are to:

63

(1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices;

(2) protect consumers from suppliers who commit deceptive and unconscionable consumer sales practices; and

(3) encourage the development of fair consumer sales practice.

Ind. Code § 24-5-0.5-1(b).

279.    The General Assembly has instructed courts to construe the DCSA liberally to promote these purposes and policies. Ind. Code § 24-5-0.5-1(a)

280.    Upperline is a "supplier" as defined in the DCSA because it is a seller or other person who regularly engages in or solicits consumer transactions, which are defined to include sales of personal property, *services*, and intangibles that are primarily for a personal, familial, or household purpose, such as those at issue in this action. Ind. Code § 24-5-0.5-2(1), (3) (emphasis added).

281.    The DCSA provides that "[a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of [the DCSA] whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a).

282.    An "incurable deceptive act" is a "deceptive act done by a supplier as part of a scheme, artifice, or device with the intent to defraud or mislead. Ind. Code § 24-5-0.5-2(a)(8).

283.    The DCSA further provides:

Without limiting the scope of subsection (a) the following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts:

a. That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have

b. That such subject of a consumer transaction is of a particular standard, quality,

64

grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not . . . .

Ind. Code § 24-5-0.5-3

284.    Upperline committed deceptive acts, including but not limited to:

a.    Encouraging patients to use Upperline's Website and Online Platforms while failing to disclose the material fact that it discloses patients' Private Information to Facebook and potentially other third parties, without authorization or permission. information relating to Plaintiff's and Class Members' medical treatment, without their knowledge, consent, or authorization, as part of a scheme, artifice or device with the intent to mislead patients.

b.    Encouraging patients to use Upperline's Website and Online Platforms while omitting the material fact that it uses patients' Private Information, without their authorization for marketing purposes and to increase its revenue.

c.    Marketing itself as a trusted healthcare provider while failing to adhere to data privacy standards that govern health care providers, including federal law and regulations, industry standards, and the fiduciary duties that apply to health care providers.

d.    By installing and implementing trackers from Facebook, Google, Microsoft, StackAdapt, and CallRail Defendant knew or reasonably should have known it intercepted and transmitted Plaintiff's and Class Member's communications from Plaintiff's and Class Members' browsers directly to the third-party creators of those trackers.

285.    Upperline's violations were willful and were done as part of a scheme, artifice, or device with intent to defraud or mislead, and therefore are incurable deceptive acts under the

65

DCSA.

286.    The DCSA provides that "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater. The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (i) three (3) times the actual damages of the consumer suffering the loss; or (ii) one thousand dollars ($1,000). Ind. Code § 24-5-0.5-4(a).

287.    The DCSA provides that "[a]ny person who is entitled to bring an action under subsection (a) on the person's own behalf against a supplier for damages for a deceptive act may bring a class action against such supplier on behalf of any class of persons of which that person is a member . . . ." Ind. Code § 24-5-0.5-4(b).

288.    Had Plaintiff and members of the Classes been aware that their Private Information would be transmitted to unauthorized third parties, they would not have entered into such transactions and would not have provided payment or confidential medical information to Upperline.

289.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices in violation of the DCSA, Plaintiff and Class Members have suffered damages for which Defendant is liable.

290.    Plaintiff and Class Members seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the DCSA. As redress for Defendant's repeated and ongoing violations, Plaintiff and Class Members are entitled to, *inter alia*, actual damages, treble damages, attorneys' fees, and injunctive relief.

**COUNT IX**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**

66

**18 U.S.C. §§ 2511(1),** *et seq.*
**(On Behalf of Plaintiff and the Class)**

291.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

292.    The ECPA protects both sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

293.    The transmissions of Plaintiff's and Class Members' Private Information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

294.    **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

295.    **Content**. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(8).

296.    **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." See 18 U.S.C. § 2510(4), (8).

297.    **Electronic, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic

communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

   a. Plaintiff's and Class Members' browsers;

   b. Plaintiff's and Class Members' computing devices;

   c. Defendant's web-servers; and

   d. Defendant's Website.

298. The tracking technology deployed by Defendant effectuated the sending and acquisition of patient communications.

299. By utilizing and embedding the tracking technology on its Website, Defendant intentionally intercepted, endeavored to intercept and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

300. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the tracking technology including the Pixel, which tracked, stored ,and unlawfully disclosed Plaintiff's and Class Members' Private Information to Facebook, Google, DoubleClick, the Trade Desk, and Frequence.

301. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding Private Information, and medical treatment.

302. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

303. By intentionally using, or endeavoring to use, the contents of the electronic

communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

304. **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

305. Defendant intentionally used the wire or electronic communications to increase its profit margins and save on marketing costs.

306. Defendant specifically used the Pixel to track and to utilize Plaintiff's and Class Members' Private Information for financial gain.

307. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

308. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy via the tracking technology.

309. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of its Website, Defendant's purpose was tortious, criminal and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person; and (ii) violation of HIPAA, the FTC Act, invading Plaintiff and Class Members' privacy, and in breach of its fiduciary duty of confidentiality.

**COUNT X**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**

69

**18 U.S.C. § 2511(3)(a)**
**UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE**
**(On Behalf of Plaintiff and the Class)**

310.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

311.    The ECPA statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

312.    **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant's Website is an electronic communication service which provides to users thereof, patients of Defendant, the ability to send or receive electronic communications; in the absence of Defendant's Website, internet users could not send or receive communications regarding Plaintiff's and Class Members' Private Information.

313.    **Intentional Divulgence**. Defendant intentionally designed the tracking technology and was or should have been aware that, if so configured, it could divulge Plaintiff's and Class Members' Private Information. Upon information and belief, Defendant's divulgence of the contents of Plaintiff's and Class Members' communications was contemporaneous with their exchange with Defendant's Website, to which they directed their communications.

314.    Defendant divulged the contents of Plaintiff's and Class Members' electronic communications without authorization and/or consent.

315.    **Exceptions do not apply**. In addition to the exception for communications directly

to an electronic communications service ("ECS")[69] or an agent of an ECS, the ECPA states that "[a] person or entity providing electronic communication service to the public may divulge the contents of any such communication."

    a. "as otherwise authorized in section 2511(2)(a) or 2517 of this title;

    b. "with the lawful consent of the originator or any addressee or intended recipient of such communication;" c. "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or d. "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency." U.S.C. § 2511(3)(b).

316. Section 2511(2)(a)(i) provides: It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

317. Defendant's divulgence of the contents of Plaintiff's and Class Members' communications to Facebook was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of Defendant's service nor (ii) necessary to the protection of the rights or property of Defendant.

---

[69] An ECS is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

318.    Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

319.    Defendant's divulgence of the contents of Plaintiff's and the Class Members' patient user communications on its Website through the tracking technology was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (i) Plaintiff and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiff and Class Members were exchanging information.

320.    Moreover, Defendant divulged the contents of Plaintiff's and Class Members' communications through the Pixel code to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

321.    The contents of Plaintiff's and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

322.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

## COUNT XI
## VIOLATION OF TITLE II OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("STORED COMMUNICATIONS ACT")
### 18 U.S.C. § 2702, *et seq.*
### (On Behalf of Plaintiff and the Class)

323.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

324.    The ECPA further provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

325.    **Electronic Communication Service**. ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant intentionally procures and embeds various Plaintiff's and Class Members' patient Private Information through the tracking technology used on Defendant's Website, which qualifies as an Electronic Communication Service.

326.    **Electronic Storage**. ECPA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

327.    Defendant stores the content of Plaintiff's and Class Members' communications on Defendant's Website and files associated with it.

328.    When Plaintiff or Class Members make a Website communication, the content of that communication is immediately placed into storage.

329.    Defendant knowingly divulges the contents of Plaintiff's and Class Members' communications through the tracking technology.

330.    **Exceptions Do Not Apply**. Section 2702(b) of the Stored Communication Act provides that an electronic communication service provider "may divulge the contents of a communication—" a. "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." b. "as otherwise authorized in Section 2517, 2511(2)(a), or

73

2703 of this title;" c. "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service;" d. "to a person employed or authorized or whose facilities are used to forward such communication to its destination;" e. "as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;" f. "to the National Center for Missing and Exploited Children, in connection with a reported submission thereto under section 2258A." g. "to a law enforcement agency, if the contents (i) were inadvertently obtained by the service provider; and (ii) appear to pertain to the commission of a crime;" h. "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency"; or "to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies Section 2523."

331.    Defendant did not divulge the contents of Plaintiff's and Class Members' communications to "addressees," "intended recipients," or "agents" of any such addressees or intended recipients of Plaintiff and Class Members.

332.    Section 2517 and 2703 of the ECPA relate to investigations by government officials and have no relevance here.

333.    Section 2511(2)(a)(i) provides: It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his

74

service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

334.    Defendant's divulgence of the contents of Plaintiff's and Class Members' communications on its Website to Facebook or other third parties was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of the Defendant's services nor (ii) necessary to the protection of the rights or property of Defendant.

335.    Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

336.    Defendant's divulgence of the contents of Plaintiff's and Class Members' patient user communications on its Website was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (i) Plaintiff and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiff and Class Members were exchanging information.

337.    Moreover, Defendant divulged the contents of Plaintiff's and Class Members' communications through the tracking technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

338.    The contents of Plaintiff's and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

339.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be

appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

## COUNT XII
### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA")
### 18 U.S.C. § 1030, *et seq.*
### (On Behalf of Plaintiff and the Class)

340.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

341.    Plaintiff's and the Class Members' computers and mobile devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

342.    Defendant exceeded, and continues to exceed, authorized access to Plaintiff's and the Class Members' protected computers and obtained information thereby, in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C).

343.    Defendant's conduct caused "loss to 1 or more persons during any 1-year period… aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), *inter alia*, because of the secret transmission of Plaintiff's and the Class Members' Private Information as set forth in detail herein, which were never intended for public consumption.

344.    Defendant's conduct also constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV), due to the private and personally identifiable data and content of Plaintiff and the Class Members' Private Information and communication being made available to Defendant, Facebook, Google, and/or other third parties without adequate legal privacy protections.

345.    Accordingly, Plaintiff and the Class Members are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and on behalf of all others similarly situated, prays for judgment as follows:

a.  for an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

b.  for an award of actual damages, compensatory damages, consequential damages, and punitive damages, in an amount to be determined, as allowable by law;

c.  for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

d.  for equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and unlawfully disclosed to third parties;

e.  for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

f.  for an award of attorneys' fees under the common fund doctrine, and any other applicable law;

g.  costs and any other expenses, including expert witness fees incurred by Plaintiff in connection with this action;

h.  pre- and post-judgment interest on any amounts awarded; and

i.  such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of herself and all others similarly situated, hereby demands a trial by jury on all issues so triable.

Dated: October 18, 2024

Respectfully submitted,

*/s/ Lynn A. Toops*
Lynn A. Toops (No. 26386-49)
Amina A. Thomas (No. 34451-49)
Mallory K. Schiller (*Pro Hac Vice* forthcoming)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
Telephone: (317) 636-6481
ltoops@cohenandmalad.com
athomas@cohenandmalad.com
mschiller@cohenandmalad.com

J. Gerard Stranch, IV (*Pro Hac Vice* forthcoming)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
gstranch@stranchlaw.com
amize@stranchlaw.com

Samuel J. Strauss
Raina Borelli (*Pro Hac Vice* forthcoming)
STRAUSS BORELLI PLLC
908 N. Michigan Avenue, Suite 1610
Chicago Illinois 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

***Counsel for Plaintiff and the Proposed Class***

78